UNITED STATES, Appellee

v

JEFFERSON D. MILLER, Corporal
U. S. Marine Corps, Appellant

6 USCMA 495, 20 CMR 211

496

No. 6567

Decided November 18, 1955

*Major Charles J. McCaffrey*, USMCR, argued the cause for Appellant, Accused. With him on the brief were *Commander James A. Brough*, USN, and *Major Melvyn H. Kerr*, USMC.

*Major Charles B. Guy*, USMC, argued the cause for Appellee, United States.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Despite his claim of innocence, the accused, Miller, was convicted—following a common trial with one Landry—of the unlawful possession of marijuana, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to be discharged from the service with a bad-conduct discharge, to forfeit all pay allowances, to be confined at hard labor for two years, and to be reduced to the grade of private. Intermediate appellate authorities have affirmed both findings and sentence—save for a reduction in the confinement imposed by the court-martial—and we granted Miller's timely petition for review to determine whether the law officer erred in the giving of certain instructions.

II

On July 8, 1954, criminal investigators—clothed with proper authority—proceeded to search the personal effects of the accused and those of a barracks-mate named John Landry. Since Landry—a suspected user of narcotics—had been seen with the accused on the previous day, the authorities conceived the belief that the pair was in possession of narcotic drugs. As a result of the search, five suspicious-appearing cigarets were discovered in a dungaree coat belonging to Landry, and four similar objects were found under the bedding of the accused's bunk. Subsequent analysis disclosed that each confiscated cigaret contained marijuana.

Testifying in his own behalf, the accused emphatically disclaimed all knowledge of the cigarets found in his bed. However, he was unable to account for their presence, or to suggest the identity of any person living in his barracks who might have been guilty of secreting the incriminating marijuana beneath his sheets.

**497**

After the defense had rested its case, counsel for Miller entered a motion for findings of not guilty. Authorities and arguments on the motion were submitted to the law officer, who overruled it promptly—stating that in his opinion the prosecution had made out a *prima facie* case. Before instructing the members of the court-martial concerning applicable law, however, he called an out-of-court conference, during which he submitted proposed instructions for the consideration and comment of all counsel in the cause. No objection was voiced by either side to any of the suggested instructions, nor was any sort of amplification or clarification requested. When the court reopened, the law officer proceeded to charge the court-martial on the elements of the offense, and thereafter attempted as follows to explain the meaning of his earlier ruling on the motion for findings of not guilty:

"You are instructed that my ruling on the motion of the defense counsel for a finding of not guilty should not be misconstrued. In that regard, I was bound by my oath as a law officer to examine the charge and the specification preferred as to each accused in the light of the evidence introduced by the prosecution, *and determine as well as I could if such evidence was legally sufficient to present a prima facie case against each accused, and that is if evidence of some legally admissible sort had been adduced to prove the essential elements of the offense charged; and if the proof had failed as to any essential element*, it would have been my duty as law officer to sustain the motion of the defense counsel. *In other words, when I say that in my opinion the prosecution has presented a prima facie case, I mean precisely that the amount and nature of the evidence introduced by the prosecution was sufficient to counterbalance the general presumption of innocence with which the accused (each of them) is clothed when they appeared for their trial, and that would warrant a conviction, if not countered and controlled by evidence tending to contradict it and to render it improbable or*

*to prove other facts inconsistent with it."* [Italics supplied.]

Appellate defense counsel contend that the law officer's explanation of his ruling on the motion for findings was materially prejudicial to the substantial interests of the accused at the trial.

III

As we interpret their argument it is a double one. First, we are told that the law officer erroneously commented on the weight of the evidence by characterizing the Government's proof as legally sufficient to establish the elements of the offense charged. Secondly, his definition of a *prima facie* case—it is claimed—effectively nullified the presumption of innocence, which normally surrounds an accused before findings. These misleading pronouncements—the argument ends—precluded the court-martial from assessing the evidence against the accused in a proper and fair manner.

The first theory on which the defense argument is based may be refuted readily. In United States v Andis, 2 USCMA 364, 8 CMR 164, we expressly held applicable to the system of military courts the Federal rule which permits a trial judge to comment on the sufficiency of the evidence—provided his comment does not distort, add to, or emphasize selected evidence unduly, and if, as well, the "jury" is informed clearly that the judge's views are no more than advisory. We observed further in that case that a Federal judge —and also a law officer—"is permitted to express an opinion even on the guilt of the defendant, so long as he advises the jury clearly and unequivocally that his opinion is not binding." Thus, in the present case—although we are to assume that the defense interpretation of the law officer's language is correct, and that the members of the court-martial were informed that in the opinion of their "judge" the evidence was sufficient legally to establish the elements of the offense charged—no harm can have been done, if it appears that cautionary limitations were later placed on that comment.

Were such danger signals in fact raised by the law officer? We are sure that an affirmative answer is required—for, immediately after uttering the remarks now assailed, he instructed the members of the court explicitly and at length concerning their duty to acquit if not convinced of guilt beyond reasonable doubt. In unmistakable terms he reminded the triers of fact that judgments concerning the credibility of witnesses lay within their *exclusive* province. Finally, he erased all doubt that ultimate factual determinations were to be made by the court-martial—and by it alone—when he admonished the tribunal's members that it was their function to weigh the evidence *independently*, and regardless of any comment made by him which might seem to indicate an opinion respecting the guilt or innocence of the accused. When the law officer's phrasing is viewed in conjunction with these subsequent pronouncements, we cannot say that the words chosen by him can have had an erroneous impact on the minds of the members of the court-martial.

The second branch of the defense argument is grounded on the definition of a *prima facie* case furnished by the law officer—that is, his statement to the effect that the Government's evidence was sufficient to counterbalance the presumption of innocence and to warrant conviction, unless controverted by other facts. In support of this contention, the accused's counsel before us advance the view that the presumption of innocence constitutes in a real sense "evidence," which accompanies the accused not only during the trial, but follows his case into the "jury room" as well. Reasoning from this premise, appellate defense counsel insist that the language chosen by the law officer removed from the path to conviction a formidable obstruction—one which rightfully should have remained to burden the Government until all doubt in the premises had been resolved. Since the onus placed on an accused person by the law properly requires that he do no more than induce reasonable doubt in the minds of the members of the court-martial, it is argued that the

instruction challenged here operated to shift at least some part of the burden of proof from the Government through depriving the appellant of what may have been that scintilla of evidence necessary to tip the scales of doubt in his favor and behalf.

Although we are willing to accept so much of the defense position as implies that the explanatory words of the law officer were in some degree inartful and ill-chosen, we are nevertheless sure that the phrasing he used did not serve to limit the accused in the enjoyment of any substantial right. We are familiar, of course, with the controversy among legal scholars—largely academic, we believe—on the subject of whether the presumption of innocence does or does not constitute "evidence" to be weighed by the triers of fact. Indeed, substantial authority supports the notion that this presumption *is* evidence favorable to an accused, and that a refusal to instruct in accordance with this view, on request, amounts to error and prejudice. Coffin v United States, 156 US 432, 39 L ed 481, 15 S Ct 394. However, it appears to us that the recent trend of juristic thinking in this area is to the effect that the phrase reduces to no more than a further and perhaps more dramatic expression of the universal rule that in a criminal case a burden rests on the prosecution to adduce evidence sufficient to produce persuasion on the part of the fact-finder beyond a reasonable doubt. See Thayer, Preliminary Treatise on Evidence at the Common Law, pages 561–567; Wigmore, Evidence, 3d ed, § 2511; United States v Nimerick, 118 F 2d 464 (CA 2d Cir); United States v Schneiderman, 102 F Supp 52 (SD Calif).

In resolving a recent question having to do with the presumption of sanity, we were presented with a similar opportunity to consider the views of learned authors with respect to the nature of a presumption. See United States v Biesak, 3 USCMA 714, 719, footnote 1, 14 CMR 132, and authorities there cited. In order to avoid the pitfalls of oversimplification, we sought to analyze in Biesak the meaning of the term, and concluded that the type of presumption

**499**

of concern to us there—that is, the presumption of sanity—was an ideal device in the nature of a compulsory inference, from the binding effect of which the court-martial was released on production of a certain quantum of evidence. The problem there—as the opinion clearly reveals—lay in the ascertainment of what quantum of proof was necessary to satisfy the evidentiary minimum, and not at all in a futile examination of sterile verbiage to determine whether a presumption is or is not, in truth, "evidence."

We are convinced that the bones of the rationale in Biesak are equally applicable to the claimed instructional inaccuracy we are here asked to correct. Although it is true that the position of the defense here is not unreasonable and finds support in certain sources, the weight of the better reasoned authority indicates that the jury is wholly free from the binding effect of the presumption of innocence—once the Government has produced probative matter of the nature and sort which the Code characterizes as "legal and competent evidence beyond reasonable doubt." Certainly, the usual instruction to the effect that an accused person is presumed innocent until his guilt is established should not be interpreted by a court-martial to preclude its members from giving weight in the determination of whether the evidence is sufficient to support conviction to the preponderance of probability revealed by their general experience. Indeed, if the rule were as the defense contends it to be, it is doubtful that many guilty accused persons would be convicted, save on the basis of confessions, eye witness testimony, or other direct evidence of guilt. From what has been said, therefore, it would seem to follow that the law officer erred here *only* if his admonitions to the court-martial served to dilute the standard of proof which the Code requires of the Government before conviction may legally ensue.

When we examine the setting into which the challenged instruction was projected, we must conclude at once that the law officer's explanation of the meaning of a *prima facie* case did not

operate to mislead the members of the court. It must be remembered that he was at the time reminding the tribunal —during the course of his instructions —that his earlier ruling on the motion for findings of not guilty was not to be misconstrued by them as an indication that the *ruling itself* was tantamount to a suggestion of the necessity for conviction. In principle, such a remonstrance seems to us to be highly salutary, and one which should be furnished generally when a motion for findings of not guilty is overruled.

It is true, of course, that, in the case at bar, the motion was made after both Government and defense had rested—a crucial period in any trial, and a time when the law officer's influence over the members of a court is apt to be substantial. Had the quoted remarks been uttered at that moment without immediate cautionary explanation, we might well be faced with a more difficult problem—this for the reason that a subsequent corrective instruction may have been ineffective in removing completely from the minds of court members the initial impact of the language used. We note, however, that as he overruled the motion, the law officer in the same breath observed that, in his opinion only, there was sufficient evidence to convict—if, indeed, the court desired to believe the testimony before it. Later, at a point midway between his advice to the court on the elements of the offense and the concluding portions of the charge, he launched into the questioned explanation of his prior ruling on the motion for findings—and followed this promptly with complete instructions concerning the presumption of innocence and the effect of a reasonable doubt on the findings of the court. In addition, he went beyond the minimal requirements of Article 51 (c) of the Uniform Code, 50 USC § 626, by defining the phrase, reasonable doubt in accordance with the precise wording of the Manual. Then after pointing out specifically that the burden of establishing the accused's guilt beyond a reasonable doubt rested squarely on the shoulders of the Government, he admonished the tribunal's members to resolve impartially the ultimate issue of

the guilt or innocence of the accused. When all of this instructional language is read—together with the particular portion torn from context by the defense—it is clear that the court-martial must have been properly impressed with its duty as a fact-finder to consider the accused guiltless until the Government's proof had convinced its members to the contrary beyond all reasonable doubt. Accordingly, we reject expressly the defense claim that the instruction complained of saddled the accused with the unwanted encumbrance of establishing his innocence by contradicting affirmatively the Government's "prima facie" case.

Yet another reason compels us to hold that reversal is not required here. Although we are to assume that certain of the law officer's statements came dangerously near to shifting the burden of persuasion from the Government to the accused, we cannot say that this is true when all portions of the instructions are taken into account—and thus there can have been no prejudice. Immediately after delivery of the instruction under attack, the members of the court heard this reminder:

"The accused *did* introduce evidence to rebut the prima facie case. Each of them took the stand and they have placed before the court the question of their guilt or innocence. Now, ·of course, the matter of the credibility of the witnesses and the weighing of the evidence is placed squarely upon *your* shoulders as members of the court." [Italics supplied.]

Thus, in clearest terms, the court-martial was informed that, regardless of prior expressions on the part of the law officer to the effect that the Government had introduced evidence sufficient to avoid an adverse ruling on the motion for findings, the evidence submitted by the defense *had* raised conflicts in testimony which only the triers of fact could be permitted to resolve. If any slightest questionable impression respecting the burden of proof had been created in the minds of the court by prior comments of the law officer, the quoted announcement must surely have

dissipated it. In any event, we find nothing in this record to suggest—and defense makes no claim—that the members of the court did not discharge their fact-finding responsibilities fully and competently.

Further—as noted in an earlier portion of this opinion—at an out-of-court hearing, defense counsel was afforded full opportunity to object to, or to request clarification of, each of the law officer's proposed instructions, including the one under scrutiny here. The same invitation was made to him at the conclusion of the charge to the court. If he harbored dissatisfaction with the instructional language used, he must be said to have failed to meet the burden of demanding elaboration by means of requesting a more careful statement or offering supplemental phrasing for the law officer's consideration. United States v Moore, 4 US CMA 482, 16 CMR 56. Consequently, we are not disposed to grant to his appellate successor a second election.

IV

A further assignment of error—argued briefly but ingeniously by appellate defense counsel—need not detain us long. As we understand the defense position here, it is urged that certain other portions of the instructions— those dealing with the accused's claim of ignorance of the presence of the marijuana cigarets in his bunk—were prejudicially erroneous in that the law officer, doubtless through an inartful choice and juxtaposition of language, placed on the former's back an illegally onerous burden with respect to the maintenance of this, his only defense at the trial.

We are quite willing to concede that here too in some sense certain isolated passages of the questioned phrasing may be said to support—in a measure— the accused's interpretation. However, a reading of the entire segment of the instructions under scrutiny removes all doubt that the members of the court-martial could have been either misled or confused. This Court has ever been

willing to evaluate parts of instructional language in light of the entire charge given. United States v Jenkins, 1 USCMA 329, 3 CMR 63; United States v Hatchett, 2 USCMA 482, 9 CMR 112. When we do this it is clear that, in the particular of present concern to the accused, the law officer's instructions safely met those minimum standards established by prior decisions of this Court. And in this connection it must not be forgotten that at no time—either during the mentioned out-of-court instructional conference or otherwise—did the accused's lawyer request any sort of elaboration or clarification. Instead, he professed himself satisfied with the law officer's proposed language in all respects. Because no new law can arise from our consideration of this facet of the case, a detailed description of the situation presenting it is deemed unnecessary.

It is to be noted with approval, however, that, at the out-of-court conference held prior to closing arguments, the law officer, together with both Government and defense lawyers, considered our opinion in United States v Lampkins, 4 USCMA 31, 15 CMR 31. There we ruled that an instruction to the effect that the defense of ignorance of fact must be both honest *and reasonable* was erroneous. In order to comply with our holding in that case, the law officer properly proposed—and later gave—a charge wholly free from the Lampkins infirmity.

V

The decision of the board of review is therefore affirmed.

Chief Judge QUINN and Judge LATIMER concur.